## MARVIN O. SCHAEFFER *v.* UNITED BANK AND TRUST COMPANY OF MARYLAND

[No. 921, September Term, 1975.]

*Decided July 26, 1976.*

The cause was argued before MOYLAN, POWERS and MOORE, JJ.

*William F. Higgins* for appellant.

*Patrick F. Mahoney* and *Charles A. Bongar, Jr.*, with whom were *Giordano, Alexander, Haas, Mahoney & Bush* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

The ultimate question presented here is whether the Circuit Court for Prince George's County properly granted appellee-payee's motion for a directed verdict in an action

upon an installment note where there was evidence that appellant, an accommodation maker, was unable to read and had been told by the accommodated party, who had been his supervisor and friend, that the document he was signing was a "character reference."

## I

In early 1973 James and Marie Estepp, husband and wife, sought a debt consolidation loan from the United Bank and Trust Company of Maryland. The bank was unwilling to make them an unsecured loan for the amount they desired without the additional signature of a real property owner in Prince George's County. To that end Mr. Estepp then approached appellant, Marvin O. Schaeffer, whom he supervised at work at the Tantallon Country Club and who owned real property in Clinton. On May 19, 1973 the Estepps signed the face of an "Unsecured Installment Note" in the amount of $5,622.69 and appellant signed the reverse side which was blank.[1] The note contained a standard confession of judgment clause.

After the Estepps had made a few of the required monthly installments of $192.93, the payments ceased and the bank communicated with appellant. Appellant advised the bank of Mr. Estepp's new telephone number and place of employment, in Las Cruces, New Mexico. The bank contacted Estepp there but, his assurances to the contrary notwithstanding, no further payments were ever received.

In due course, appellant was invited to the bank "to make arrangements for him to start paying on the loan." He endeavored, unsuccessfully, to have the Estepps resume the payments and the bank ultimately obtained judgment by confession against him in the amount of $5,313.83. Appellant's motion to vacate the confessed judgment was

---

1. With life insurance and finance charges the total amount owed the bank was $6,931.08. Much was made at trial and on appeal of the exact appellation to be given to appellant as the additional obligor. We are satisfied from the plain language of the note and the provisions of the Annot. Code of Md., Commercial Law Art. § 3-402 (1975), that appellant was an accommodation maker.

granted (Couch, J.) and appellant filed a general issue plea. He also alleged that the bank obtained the note "by misrepresentation and without consideration to or from the defendant" and "in violation of the Federal Consumer Protection Act [2] and Article 49 of the Annotated Code of Maryland" [now §§ 12-106 and 12-114 (b) of the Commercial Law Article], which provides that lenders must furnish borrowers with certain information concerning the terms of the loan. Appellant also prayed a jury trial.

At the conclusion of its case the bank moved for a directed verdict, which the court denied. At the conclusion of the entire case, the bank renewed its motion and it was granted. The court stated:

> "It is unfortunate that he may have a limited education and the Court can sympathize with him, *but I do not think that the United Bank did anything wrong in this case in its dealings and I have not seen any evidence here today that it committed any kind of fraud on this particular defendant.* I have given you all the latitude that I can to try to show some fraud or misrepresentation. You have not been able to do it to my satisfaction.

> "I do not think that I should submit this case to a jury and that is how I feel about it. I do not think they should be allowed to speculate on this because you have not met the burden that the Court of Appeals has made out to show some kind of fraud or misrepresentation." (Emphasis added.)

It is manifest that the court overlooked evidence of fraud on the part of the maker, James Estepp, and herein resides reversible error.

## II

When the trial court was required — by the bank's motion for a directed verdict — to rule upon the legal sufficiency of the evidence for submission to the jury of appellant's

---

2. The alleged violation of the federal statute was not pursued at trial.

liability on the note, it had to assume the truth of all credible evidence and of all inferences fairly deducible therefrom and consider them in the light most favorable to appellant as the party against whom the motion was made. It is only when such evidence and inferences lead to conclusions from which reasonable minds could not differ, that the issue is one of law for the court and not one of fact for the jury. *Holloway v. Hauver,* 22 Md. App. 303, 322 A. 2d 890 (1974); *Lauer v. Scott,* 12 Md. App. 555, 280 A. 2d 917 (1971).

During the course of the brief trial below, appellant was called by the bank as its own witness. He identified his signature on the reverse side of the note but also stated that he had only a third grade education and had limited reading ability. "I can't sit down and read a newspaper or nothing." He was asked by the bank's counsel why he did not consider himself responsible for the debt and the following colloquy ensued:

"Q. Well, Mr. Schaeffer, will you tell us please why you do not feel apparently that you should pay this debt?

"A. Because Jim Estepp when he told me to sign that paper it wasn't for paying a debt.

"Q. Well now, you are saying Jim Estepp. You are not saying United Bank and Trust Company; is that correct?

"A. No. Jim told me that when he filled the application out to sign and I signed it. He said it was a character witness.

\* \* \*

"Q. Are you stating nobody explained to you that this was a note?

"A. No, sir."

Under questioning by his own counsel, appellant testified that he had known Estepp for approximately eight years, that Estepp had been his boss at the Tantallon Country Club and had assisted him in the making of funeral arrangements

at the time of appellant's wife's death. "I thought he was a wonderful guy," he said.

The officer in charge of installment loans on the date of the transaction with the Estepps explained the circumstances surrounding appellant's signing of the note:

> "A. Well, I told Mr. Schaeffer that he would — that he was responsible for the loan if he signed the note and he didn't say anything and then he and Mr. Estepp started talking about something and I felt that the man maybe didn't know, I don't know, that he was signing as an endorser so I thought that they should talk it over and I left. When I came back I asked them if it was straight, if everything was all right, and he signed the note. That's all I know."

In appellant's own case, his stepmother testified that the vision in his right eye had been impaired by a bottle explosion, that he had attended school only until the third grade, had a learning disability and could not read or write. His brother-in-law testified that he had completed the job application for appellant's then employment as a groundskeeper and mechanic because "He can't read and write."

Under the established rule, previously stated, the evidence in the light most favorable to the appellant would establish (1) that he was almost illiterate, (2) that the nature of the transaction was not explained to him by the bank, (3) that he did not understand that he was assuming any financial responsibility when he signed the note and (4) that Mr. Estepp falsely and fraudulently misrepresented the document. This evidence mounts up to fraud in the *factum*.

Fraud in the *factum*, unaccompanied by negligence, is one of the most potent defenses in the realm of commercial law. When it is successfully interposed it bars recovery not only by the promisee on a simple contract (Restatement, Contracts § 475), but also by a holder in due course, § 3-305, Commercial Law Article.

In discussing the elements of fraud in the *factum*, official comment 7 to § 3-305 of the Commercial Law Article is instructive:

> "The test of the defense here stated is that of excusable ignorance of the contents of the writing signed. The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge. In determining what is a reasonable opportunity all relevant factors are to be taken into account, including the age and sex of the party, his intelligence, education and business experience; his ability to read or to understand English, the representations made to him and his reason to rely on them or to have confidence in the person making them; the presence or absence of any third person who might read or explain the instrument to him, or any other possibility of obtaining independent information; and the apparent necessity, or lack of it, for acting without delay."

Here appellant was a man of limited intelligence, little education, and virtually no ability to read English. His supervisor at work, who had assisted him in the funeral of his wife, and in whom he "had complete confidence in what he said" at the time the note was signed, misrepresented the very essence of the transaction.

In a strikingly similar case, a New Jersey court observed:

> "The evidence supports the trial court's finding that De Paul signed the note in issue in reliance upon the false representation made to him by the maker, Ronald Perkowsky, that he was signing only a 'character reference' which Perkowsky needed in connection with the purchase of merchandise from Bushberg Brothers of Union City, the payee of the instrument. Because of his subnormal mentality, his only schooling having been in a 'special class' of the public school, De Paul was not able to read, except small words, and then he needed reading

glasses for this purpose. When he signed this note, he did not read it; he had no reading glasses with him, and the note was not read to him by Perkowsky or the representative of Bushberg Brothers who witnessed his signature. It seems clear, therefore, that the district court was correct in finding that De Paul's signature was obtained as the result of fraud in the *factum*, without any negligence on his part.

\* \* \*

"The rationale of the defense is the fundamental of contract law that one cannot be bound on an obligation he does not know he is entering into. Restatement, Contracts, § 475." *Amsterdam v. De Paul*, 175 A. 2d 219, 220 (App. Div. 1961). *See also, Kearney v. Commerce Investment Co.*, 262 A. 2d 804 (D. C. App. 1970).

Here, of course, the bank was not a holder in due course, but the same considerations lead us to the conclusion that appellant was a victim of fraud in the *factum*.

In *Amsterdam* the plaintiff holder in due course argued that since the fraud was perpetrated by a maker upon a co-maker rather than by the payee, "the defense was not available as against the payee or its transferee, the plaintiff." 175 A. 2d at 221. In the instant case the bank correctly argues that "there was no testimony or evidence of fraud perpetrated by the appellee on the appellant." This argument is, however, irrelevant. When the individual charged on a note successfully interposes the defense of fraud in the *factum* it is immaterial *who* perpetrated the fraud. As the New Jersey court said in *Amsterdam*:

"[W]e find no validity in such a distinction. A negotiable instrument which is the product of fraud in the *factum*, unaccompanied by negligence, as distinguished from an instrument which is the product of fraud in the treaty, is void, and not

merely voidable. As stated in 17 C.J.S. Contracts § 140, p. 495:

'Where some trick is used to substitute another instrument for the one which it is intended to sign, as where a note is substituted for a receipt, and in like cases, the signature has no legal effect, * * *. Hence there is no agreement which can give rights to anyone, except where the signer is estopped by negligence or otherwise to set up the truth as against bona fide third persons * * *.'

"In McDonald v. Central R. R. Co., . . . 98 A. 391, 392 ([N.J.] 1916) the court said:

'A misrepresentation of the contents of a document by which one is induced to sign a paper thinking it is other than it really is is the typical case of fraud in the execution; it is a case where the defrauded party may properly say, "I never agreed to that, and hence the document is not my deed." ' "

175 A. 2d at 221.

Because there was evidence in this case from which a jury could have found appellant not liable on the note, it was error for the court to grant a directed verdict for the bank. In so holding, we are mindful that counsel for the appellant did not argue here — nor in the court below — the issue of fraud on the part of Mr. Estepp. This is not a situation governed by Maryland Rule 1085, under which the scope of our review is limited to questions which "have been tried and decided by the lower court." The motion by the bank for a directed verdict was made on the ground that Mr. Schaeffer had failed to prove any fraud or misrepresentation on the part of the bank. As we have seen, however, the absence of fraudulent conduct on the part of the payee was not dispositive of the case. It was incumbent on the trial court, in its consideration of the motion for a directed verdict, to consider the sufficiency of *all* the evidence on the issue of Schaeffer's liability on the note in the light of the pleadings. The defense of fraud in the *factum* was within the

ambit of the general issue plea, since that plea properly encompasses any defense other than those which must be specially pleaded under the provisions of a statute or rule. Md. Rule 342; *Herrick v. Swomley,* 56 Md. 439, 456 (1881); 2 Poe, *Pleading and Practice,* §§ 606-608 (6th ed. 1970).

### III

Appellant makes several arguments that require consideration, although only minimal, because a new trial must be ordered.

Much is made of the fact that two witnesses, Mr. Buckingham and his predecessor at the bank, Betty R. Coleman, characterized appellant as being an "endorser" of the note. Since the note provided that

> "It is agreed by any person, firm or corporation who writes his, her or its name or signature on the face or back of this instrument, that they and each of them shall be regarded as makers as between them and each of them and any holder hereof."

and because § 3-402 of the Commercial Law Article, Annot. Code of Md. (1975) provides that "Unless the instrument clearly indicates that a signature is made in some other capacity it is an indorsement," it is clear that appellant was, if anything, a maker of the note.[3] It seems to us, however, that it is of little moment whether appellant was a maker or an endorser since the contract and warranty liabilities of each class of signatories to a note are not so dissimilar as to predicate appellant's liability here upon the distinction between a maker and an endorser. Commercial Law Art., §§ 3-413, 3-414, 3-417.

Appellant is also off the mark in his stubborn pursuit of the trial court's refusal to permit him to elicit testimony concerning the fact that he had received no consideration from the bank for the note. As a leading text states:

> "At the outset one should understand that an

---

**3.** If appellant was a maker, he was necessarily an accommodation maker, since he "signed the instrument . . . for the purpose of lending his name to another party to it." § 3-415 (1), Commercial Law Art.

accommodation party's failure to receive dollars in his pocket from the creditor is not a defense. Time and again sureties respond to a holder's suit by arguing, 'I am a surety and I did not receive consideration for my contract.' This is a losing argument. Section 3-415(2) specifically provides that the surety is liable to a taker (and *a fortiori*, holders and holders in due course) when the instrument is taken for value before it is due. Regardless whether the surety signs gratuitously or receives compensation, his obligation is supported by the consideration which moves from the creditor to the principal debtor." (Footnotes omitted.)

White and Summers, *Uniform Commercial Code*, § 13-14 (1972) at 433 and the cases therein cited.

Finally, even if the bank did not furnish appellant a copy of the statement described in § 12-106 of the Commercial Law Article, such failure did not provide appellant with a defense to the bank's action. That statement is, by the terms of § 12-106 (b), required to be given to the "borrower"; and the latter term is defined in § 12-101 (b) as a "person who borrows money under this subtitle." We do not find that appellant's status as an accommodation maker falls within that definition. Furthermore, § 12-114 provides a criminal penalty for failure to furnish such a statement *when it is required*, but the statute does not address itself to civil remedies.

> *Judgment reversed; case remanded for a new trial; costs to be paid by appellee.*